EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JACINTO TORRES, acusado y apelante.

No. 6653.—*Sometido:* Diciembre 10, 1937. *Resuelto:* Enero 18, 1938.

*Alfonso Lastra Chárriez* y *J. Ramírez Viñas,* abogado del apelante;
*R. A. Gómez, Fiscal* y *Luis Janer, Fiscal Auxiliar,* abogados de El
Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

Jacinto Torres, acusado de asesinato, fué convicto de homicidio voluntario y sentenciado por la Corte de Distrito de Arecibo a la pena de tres años y seis meses de presidio. Contra esa sentencia ha interpuesto el presente recurso.

En el acto de la vista el acusado admitió haber dado muerte a Ramón Rosa Sicardó, y basó su defensa en la alegación de que lo había hecho en ocasión en que el interfecto perpetraba un delito de robo (*felony*) dentro de la tienda del acusado.

En el primer señalamiento de error se alega que el veredicto es contrario a derecho y a la evidencia presentada en el juicio. Examinaremos la prueba de cargo.

El testigo Cándido de Cacho, Juez Municipal de Manatí, declaró que fué avisado de que había ocurrido un caso en la tienda de Carrión, donde trabaja el acusado; que al entrar en el establecimiento encontró frente a unas vidrieras el cadáver de Ramón Rosa; que la policía trajo allí al acusado; que éste le manifestó que lo había matado porque lo había

cogido robando y que estaba cerca, detrás de la caja registradora; que el acusado le manifestó que había visto a Rosa meterse por el enrejillado que hay en la parte atrás de la tienda y que lo dejó libre y cuando Rosa se dirigió donde estaba la caja registradora y empezó a manipularla, entonces él sacó el revólver y le disparó un tiro y se agarró con el interfecto y dieron la vuelta hacia afuera, donde cayó Rosa muerto; que el cadáver estaba descalzo y que se fijó en que sus pies estaban limpios.

Angel Guillermo Rosa declaró ser hermano del interfecto; que en el día de autos, como a las dos y media de la tarde, el testigo y el interfecto se dirigieron hacia la tienda del acusado para comprar un par de medias; que al llegar a la tienda preguntaron al acusado si quería venderles un par de medias y éste contestó que no; que entonces cruzaron la carretera y se pararon allí a hablar con un muchacho; que en ese momento salió el acusado y los llamó; que el interfecto se fué y él fué detrás; que el acusado no dejó entrar al testigo, diciéndole que tenía que decir una cosa a Ramón (el interfecto); que su hermano entró a la tienda y él esperó en la puerta y se puso a lavarse las manos; que después que su hermano entró el acusado cerró la puerta; que mientras se lavaba las manos sintió una detonación, corrió a la vitrina, miró y no vió nada y ahí mismo salió el acusado a la puerta gritando: "Cógelo guardia, que lo maté"; que cuando su hermano entró a la tienda llevaba zapatos; que al oír al acusado gritar que lo había matado, él se fué para su casa y que no vió a su hermano muerto en la tienda; que desde que su hermano entró a la tienda hasta que sonó el disparo transcurrió como un minuto y desde el disparo hasta que el acusado abrió la puerta como dos minutos.

Pelegrín Busquets, Cabo de la Policía Insular, declaró que al llegar al sitio del suceso encontró allí al guardia Valedón, al acusado y al muerto; que el acusado le dijo que lo había matado porque lo había encontrado robando allí, pero no dijo qué era lo que estuviera robando.

Enrique Valedón, Policía Insular, declaró que a las tres de la tarde sintió el disparo y se dirigió a la tienda del acusado y tocó dos o tres veces y se abrió la puerta; que al preguntarle al acusado qué pasaba éste le dijo: "Acabo de matar a un individuo porque hace tiempo que nos viene robando" y que con anterioridad a ese hecho ellos habían notado hurtos de dinero en la tienda; que el interfecto llevaba ropa sucia y estaba descalzo; que el acusado y sus socios habían reportado a la policía varios hurtos ocurridos en la tienda; que el día de autos él estaba de servicio en la calle frente a la tienda del acusado; que no vió el establecimiento abierto en ningún momento ni vió entrar gente por el frente, pues era domingo y estaba cerrado.

Los testigos de cargo Manuel Morán, Fidel Benero y Vicente García corroboraron las declaraciones precedentes.

Andrés Agosto declaró que el día de autos cuando venía de su casa para el pueblo vió al interfecto que iba delante de él acompañado de su hermano; que los conocía a los dos de vista; que cuando llegaron a la entrada del pueblo ellos siguieron y él se quedó parado; que eran como las tres menos cuarto de la tarde; que ellos siguieron para arriba por la Calle Principal, que es donde está la tienda del acusado; que el interfecto Ramón Rosa iba con ropa sucia y llevaba unos zapatos viejos y negros.

Guadalupe Moll, declaró que cuando regresaba de la Central para el pueblo, como a las 3 P. M., vió al acusado y al interfecto hablando en la puerta del establecimiento del acusado; que el acusado estaba parado arriba y el interfecto abajo y el hermano de éste parado al pie de un puesto de gasolina; que él, el testigo, siguió su camino para la farmacia; que sintió un escándalo en la esquina y cuando regresó el muchacho estaba muerto; que como a los cinco minutos de haber pasado por allí oyó la detonación; que él no sintió detonaciones sino un escándalo; que viró para abajo al oír la gritería de que habían matado a fulano y cuando fué abajo vió al muchacho muerto; que no oyó la conversación entre

el acusado y el interfecto; que el interfecto no llavaba chaqueta ni sombrero e iba calzado con zapatos negros.

Para sostener su teoría de que Ramón Rosa fué muerto en momentos en que trataba de cometer un hurto dentro del establecimiento del acusado, éste presentó varios testigos, los cuales declararon como sigue:

Dionisio García Torres declaró que durante una hora y media antes del suceso se encontraba en el Café de Antonio Torres, situado frente a la tienda del acusado; que no vió por allí a Ramón Rosa, pero que lo vió antes vestido de blanco en un sitio que llaman "El Troly"; que en ningún momento vió a Ramón Rosa frente a la tienda del acusado; que más tarde al oír un disparo en la casa de Carrión corrió hacia la tienda creyendo se trataba de un suicidio, pues la casa estaba sola y cerrada; que como a los dos minutos de él llegar allí el acusado abrió la puerta y dijo "aquí maté a uno", y en ese momento llegó el policía Valedón; que vió al interfecto desde fuera y estaba descalzo y con ropa sucia, en una condición distinta a la en que lo había visto a la una de la tarde.

Pelegrín Busquets, Cabo de la Policía Insular, declaró que después del levantamiento del cadáver él practicó una investigación; que en la parte atrás del establecimiento encontró una escalera montada sobre un cajón y apoyada en el establecimiento de Carrión; que la escalera llegaba hasta unas alfajías puestas en la parte alta para proteger el establecimiento; que el testigo Benero se subió a una escalera para traquetear con las alfajías y sacó una con la mano y otra se cayó; que cuando vió las alfajías de primera intención las vió bien puestas; que las alfajías estaban aparentemente clavadas; que cuando Benero las manipuló se trajo una que se desclavó fácilmente, sin tener que halar fuertemente; que el pedazo de alfajía que se desclavó era como de dos pies de largo; que desde las alfajías al aparador dentro de la trastienda hay una distancia de cinco y medio

.a seis pies; que después de quitada la alfajía quedaba un hueco de nueve a diez pulgadas de ancho y dos pies de largo.

Esteban Carrión declaró ser uno de los socios de la casa Carrión; que en la casa ocurrieron robos a menudo por lo que él se quejó a la policía, pero que nunca se podía coger al que robaba; que en vista de eso decidió poner un guardia; que la noche del día anterior al de autos hicieron la guardia Cruz Carrión y Juan Grauló hasta las 6 de la mañana del domingo; que él estuvo de guardia el domingo desde las seis hasta las 10.30 A. M. que fué sustituído por Grauló hasta las 12 que vendría Jacinto Torres, el acusado, a almorzar y a hacer la guardia. Continuó declarando en corroboración de lo declarado con referencia a las alfajías de la trastienda y dando detalles sobre los diversos hurtos que se habían hecho en la tienda.

Creemos innecesario resumir las declaraciones de los demás testigos, por ser ellas meras repeticiones o corroboraciones de las anteriores.

La evidencia, considerada en conjunto, presenta un conflicto entre dos teorías. La prueba de la defensa tiende a sostener la teoría de que el interfecto penetró en la tienda del acusado, a las tres de la tarde, con el propósito de cometer allí un delito de hurto; y que el acusado, quien se encontraba allí haciendo guardia, le hizo un disparo que le privó de la vida. La prueba del fiscal tiende a sostener la de que el acusado invitó al interfecto a entrar a la tienda, se encerró allí con él y lo mató. El jurado dirimió el conflicto declarando al acusado culpable de homicidio voluntario, o sea de haber dado muerte ilegal a un ser humano, sin que mediara en ello malicia. Asumiendo, por lo tanto, que el jurado aceptó y creyó que la muerte de Ramón Rosa ocurrió en la forma y manera expuestas por el propio acusado, ¿estuvo justificado el jurado al declararle culpable de homicidio voluntario? Creemos que sí.

Nuestro Código Penal contiene las siguientes disposiciones:

"Artículo 209.—Podrá también justificarse el homicidio cuando lo cometiere alguna persona en cualquiera de los casos siguientes:

"1. En el acto de resistir o impedir la tentativa de asesinato o de inferir grave daño corporal a alguna persona, o de cometer algún delito grave (*felony*).

"2. Cuando se comete al defender una morada, propiedad o persona contra alguno que manifiestamente intente o procure, por medio de violencia o sorpresa, cometer cualquier delito grave (*felony*) o que violenta, desordenada y tumultuosamente intente o procure penetrar en la morada de otro con el propósito de agredir a alguna persona que se hallare en ella.

"3. Cuando se comete en legítima defensa de dicha persona, o de la esposa o esposo, padre o madre, hijo, amo, o sirviente de tal persona, siempre que hubiere motivos fundados para sospechar que existe el propósito de cometer un delito grave (*felony*) o de inferir grave daño corporal, e inminente riesgo de que tal propósito se realice; pero dicha persona, o la persona cuya defensa se intentare, si fuere el agresor, o estuviere empeñada en lucha mortal, deberá tratar de desistir de ella, antes de cometerse el homicidio.

"4. Cuando hubiere necesidad de cometerlo, al intentar por medios legítimos, la prisión de algún reo de delito grave (*felony*), o al procurar legalmente mantener el orden público.

"Artículo 210.—La mera sospecha de la comisión de cualquiera de los delitos mencionados en los números 2 y 3 del anterior artículo, para impedir los cuales puede legalmente cometerse el homicidio, no bastará para justificarlo; sino que las circunstancias que concurran deberán ser suficientes para excitar el temor de una persona razonable y será preciso que el matador obre sólo bajo la influencia de dicho temor."

Según las declaraciones hechas por el propio acusado inmediatamente después del suceso, él vió cuando el interfecto entró a la trastienda por el hueco entre las alfajías; le dejó entrar hasta donde estaba la caja registradora y cuando el interfecto empezó a manipular la caja, el acusado le hizo el disparo que le ocasionó la muerte. Aceptando como verídicos los hechos relatados por el acusado, ellos no son suficientes en derecho para justificar el homicidio que se le imputa. Al

penetrar en la tienda, a las tres de la tarde, con el propósito de hurtar dinero o mercancías, el interfecto cometía un delito de escalamiento en segundo grado, castigable con pena de cárcel por un término máximo de dos años y calificable como *misdemeanor*. Véanse: Artículos 14, 408 a 410 del Código Penal, ed. 1937. No aparece de la prueba que el interfecto tratara de inferir grave daño corporal al acusado, antes de que éste le hiciera el disparo. Véase *Pueblo* v. *Díaz*, 16 D.P.R. 70. La lucha entre el acusado y el interfecto ocurrió, según declaración del propio acusado, después que éste hizo el disparo. El interfecto luchó para defender su vida, después de haber recibido la herida que le privó de ella.

Somos de opinión que el veredicto rendido por el jurado se ajusta a la ley y está ampliamente sostenido por la prueba. Y no habiéndose demostrado que el jurado obrara con parcialidad, pasión o prejuicio, nuestro deber es respetar ese veredicto. *Pueblo* v. *Díaz*, supra.

El segundo señalamiento se refiere a la negativa de la corte inferior a dar al jurado ciertas instrucciones solicitadas por la defensa.

1. La primera instrucción denegada lee así:

"El Artículo 238 del Código Penal de Puerto Rico define el delito de robo de la siguiente manera:

" 'Robo es la criminal apropiación de la propiedad perteneciente a o en posesión de otra persona, de su persona o inmediata presencia contra su voluntad por medio de violencia o intimidación.'

"El delito de robo es un delito 'felony' grave y la tentativa para cometer el delito de robo es también un delito grave."

No cometió error el tribunal inferior al negarse a dar tal instrucción. La evidencia no demostró que en el momento de recibir la herida que le causó la muerte el interfecto estuviese cometiendo o tratando de cometer un delito de robo, tal como lo define el artículo 238 del Código Penal. No hubo prueba alguna de que el interfecto tratara por medio de la intimidación o de la violencia de apoderarse de bienes pertenecientes al acusado. La instrucción denegada hubiese con-

fundido al jurado. Un acusado no tiene derecho a que se den al jurado instrucciones sobre materias que no han sido objeto de prueba. Además, las instrucciones dadas por la corte inferior cubrieron perfectamente el tema, estableciendo las diferencias esenciales entre los delitos de robo, hurto y escalamiento.

2. La segunda instrucción denegada, decía:

"De acuerdo con lo que dispone el Artículo 208 del Código Penal de Puerto Rico, el homicidio, o sea el dar muerte a una persona, ya se califique éste por el Fiscal como asesinato o como homicidio, es justificable cuando se comete por una persona particular al resistir cualquier tentativa para matar a otra persona o para cometer un delito grave, 'felony', o cuando se comete en defensa del hogar, la propiedad o la persona del acusado."

No hubo error en tal denegación. La instrucción solicitada es contraria a derecho y claramente errónea. En primer lugar, el artículo 208 en ella citado. (supra) no es de aplicación. Es el artículo 209, supra, el que define los casos en que una persona está justificada al dar muerte a otra. Ni dicho artículo ni ningún otro precepto legal justifica el que una persona dé muerte a otra en defensa de una propiedad, a menos que se trate de privarle de ella por medio de violencia o sorpresa. El acusado en el caso de autos no tenía derecho a matar a Ramón Rosa por el solo hecho de que éste estuviera tratando de abrir una caja registradora. Y no se presentó evidencia alguna de que Rosa recurriera a la violencia, a la sorpresa o a la intimidación para tratar de realizar el hurto.

3. La tercera instrucción solicitada por la defensa y denegada por la corte inferior decía:

"De acuerdo con el artículo 211 del Código Penal de Puerto Rico, si aparece en un proceso contra un acusado, por el hecho de haber dado muerte ilegal a otra persona, que el acusado realizó la muerte de que se le acusa bajo circunstancias que lo justifiquen, en su juicio el acusado debe ser absuelto y exonerado en absoluto."

Opinamos que la corte sentenciadora no erró al negarse a dar tal instrucción. Es cierto que la instrucción se ajusta al lenguaje del artículo 211 del Código Penal, pero resulta incompleta y confusa por no hacerse en ella una exposición de las circunstancias bajo las cuales una persona está justificada al dar muerte a otra. Sin esa exposición el jurado no estaría en condiciones de poder determinar si la muerte de Rosa había ocurrido bajo circunstancias reconocidas por la ley como suficientes para justificar el homicidio. Hemos estudiado cuidadosamente las instrucciones dadas por la corte sentenciadora y encontramos que ellas cubren amplia y correctamente el punto que la defensa trató de cubrir mediante la instrucción denegada. El acusado no fué en modo alguno perjudicado por la denegación.

■■■ 4. La corte sentenciadora rehusó dar la siguiente instrucción:

"Una persona tiene el derecho legal de defender su propiedad de cualquier otra que criminalmente trate de incautarse de ella, y también tiene derecho a evitar la comisión de un delito grave, usando la fuerza que fuere necesaria, yendo hasta el extremo de acometer a la persona que trate de apoderarse violentamente o por sorpresa de su propiedad, o que trate de cometer un delito grave."

Aún cuando la instrucción que antecede se ajusta a la ley, sin embargo, considerada por sí sola y sin tener en cuenta los hechos del caso, hubiera podido confundir al jurado. Si hubo algún error en la negativa de la corte inferior, estimamos que ese error no pudo perjudicar en manera alguna los derechos substanciales del acusado, toda vez que las instrucciones generales dadas por el juez sentenciador cubrieron amplia y correctamente la misma materia.

5. Opinamos que no hubo error en la denegación de la siguiente instrucción:

"Si analizada la prueba del fiscal y de la defensa los señores del jurado llegan a la conclusión de que el interfecto Ramón Rosa, entró al establecimiento del acusado por sorpresa, para robar en la inme-

diata presencia del acusado, con violencia e intimidación trata de apoderarse de cualquier propiedad del acusado, y para evitar que el interfecto se apoderara de esa propiedad, o que realizara el delito de robo, el acusado disparó, entonces es el deber de absolverlo.''

Ni la teoría de la defensa ni la prueba aducida en su apoyo daban derecho al acusado a exigir tal instrucción. No hubo prueba alguna de que el interfecto entrara al establecimiento por sorpresa. Si alguna sorpresa hubo en el caso de autos fué la que experimentó el interfecto al ver interrumpida su manipulación de la caja por el disparo que sin previo aviso le hiciera el acusado. Tampoco hubo prueba de que el interfecto recurriera a la violencia o a la intimidación para apoderarse de propiedad alguna. El propio relato de los hechos que el acusado hizo inmediatamente después del suceso demuestra que el acusado no fué sorprendido, pues él se encontraba allí, en acecho, armado y dispuesto a matar a cualquiera que pudiese entrar para cometer un hurto. No hubo prueba alguna de que el interfecto estuviese armado.

■ 6. La sexta instrucción denegada se refería a la duda razonable y decía así:

''Si los señores del jurado tienen duda razonable en cuanto a si los hechos sucedieron como dice la prueba del Pueblo, o si sucedieron como dice la prueba de la defensa, es decir, que después de un justo e imparcial (sic), y considerar toda la prueba ofrecida en el caso, los señores del jurado se encuentran en tal condición de ánimo que puedan decir si realmente, sin lugar a dudas razonables, que en efecto el interfecto entró allí en la forma y manera que alega el acusado, pero tampoco pueden decir realmente sin lugar a dudas que el interfecto entró en la forma que alega el Pueblo de Puerto Rico, entonces es también el deber de los señores del jurado dar el beneficio de la duda al acusado y absolverlo.''

La corte inferior no erró al negarse a dar tal instrucción. Además de ser confusa y de no fácil comprensión, ella equivalía prácticamente a ordenar la absolución perentoria del acusado. El jurado no podía tener dudas en cuanto a que los hechos ocurrieron en la forma en que los relató el acusado. El veredicto de homicidio voluntario indica claramente que ellos

creyeron y aceptaron la teoría de la defensa, pero estimaron que las circunstancias bajo las cuales el acusado dió muerte a Ramón Rosa no eran legalmente suficientes para justificar el homicidio. El hecho fundamental del caso no fué controvertido. Que el acusado mató a Rosa fué un hecho admitido por el propio acusado. La única cuestión a resolver era si la muerte estaba justificada. El jurado la resolvió, a nuestro juicio, correctamente y en la forma más favorable para el acusado, pues opinamos que los hechos relatados por el acusado eran suficientes para sostener un veredicto más severo. La única duda posible era la de si el acusado había cometido un asesinato, como alegaba el Fiscal, o si había cometido un homicidio, de acuerdo con los hechos admitidos por la defensa. Y es evidente que el jurado dió al acusado el beneficio de esa duda al declararle culpable de homicidio.

■ En el último señalamiento se imputa a la corte inferior haber cometido error al dar al jurado la siguiente instrucción:

"Si los señores del jurado tienen duda razonable de si este hombre fué el que cometió el delito, o fué el que dió muerte al interfecto, o si los señores del jurado tienen duda razonable de si aquí se ha probado o no la culpabilidad del acusado, entonces debéis absolverlo.

"Duda razonable es aquel estado en que queda la conciencia cuando no tiene certeza moral de si se ha cometido o no el delito."

No nos convence el apelante de que se haya cometido el error señalado. El jurado era el llamado a resolver si fué el acusado quien dió muerte al interfecto, aún cuando la prueba así lo demostrara claramente. Y no podía haber error en decirle al jurado que si tenían duda razonable en cuanto a ese extremo debían absolver al acusado. Tampoco hubo error en decirle al jurado que debían absolver al acusado en el caso de que tuvieran duda razonable en cuanto a si se había probado o no su culpabilidad.

Hemos leído detenidamente las instrucciones dadas por el juez sentenciador al jurado y no encontramos en ellas nada que pueda considerarse como error perjudicial a los derechos

del acusado. Admitido por el acusado el hecho de haber dado muerte al interfecto, su absolución sólo podía basarse en la justificación del homicidio. El jurado estimó que la muerte de Rosa no estuvo justificada. Y nosotros opinamos que el veredicto fué justo.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Señor Córdova Dávila no intervino.